UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BLANCA ELAINE MARTINEZ,

        Plaintiff,

v.                                    Case No. 8:20-cv-1025-TPB-AEP

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review of the denial of her claim for a period of disability and disability insurance benefits ("DIB"). As the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and employed proper legal standards, it is recommended that the Commissioner's decision be affirmed.

## I.

### A.    Procedural Background

Plaintiff filed an application for a period of disability and DIB (Tr. 196-97). The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration (Tr. 69-99, 104-13). Plaintiff then requested an administrative hearing (Tr. 114-15). Per Plaintiff's request, the ALJ held a hearing

---

[1] Kilolo Kijakazi is now the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kilolo Kijakazi should be substituted for Commissioner Andrew M. Saul as the defendant in this matter. No further action needs to be taken to continue this matter by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

at which Plaintiff appeared and testified (Tr. 41-68).  Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 22-40).  Subsequently, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-7, 189-95).  Plaintiff then timely filed a complaint with this Court (Doc. 1).  The case is now ripe for review under 42 U.S.C. § 405(g).

**B.      Factual Background and the ALJ's Decision**

Plaintiff, who was born in 1972, claimed disability beginning July 31, 2017 (Tr. 196).  As to her education, Plaintiff did not complete high school (Tr. 48, 213).  Plaintiff's past relevant work experience included work as an administrative assistant (Tr. 64-65, 213).  Plaintiff alleged disability due to heart problems, diabetic retinopathy, bleeding in the eyes, and neuropathy (Tr. 212).

In rendering the administrative decision, the ALJ concluded that Plaintiff met the insured status requirements through December 31, 2019 and had not engaged in substantial gainful activity since July 31, 2017, the alleged onset date (Tr. 27).  After conducting a hearing and reviewing the evidence of record, the ALJ determined Plaintiff had the following severe impairments: degenerative disc disease, peripheral vascular disease, hypertension, coronary artery disease, atrial fibrillation, obesity, diabetes mellitus, chronic kidney disease, retinal disorder, and cataracts (Tr. 27).  Notwithstanding the noted impairments, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (Tr. 29).  The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform light work, except that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and walk six hours per day; sit six hours per day; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; frequently handle, finger, or feel; and must avoid temperature extremes, pulmonary irritants, vibration, hazardous machinery, and heights (Tr. 30)  In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 31).  Considering Plaintiff's noted impairments and the assessment of a vocational expert ("VE"), the ALJ determined that Plaintiff could perform her past relevant work as an administrative assistant as generally performed (Tr. 34).  Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 34).

## II.

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The SSA, in order to regularize the adjudicative process, promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. *See* 20 C.F.R. § 404.1520(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4). If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the Commissioner to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 404.1520(a)(4)(v) & (g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision. *Winschel*, 631 F.3d at 1178 (citations omitted); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

### III.

Plaintiff argues that the ALJ erred by (1) failing to find Plaintiff's mental

5

health limitations severe and failing to include such limitations in the RFC or hypothetical to the VE; (2) failing to include limitations posed by her diabetic retinopathy and diabetic polyneuropathy in the RFC; (3) failing to afford adequate weight to the opinion of Dr. Nader Said; (4) failing to properly consider the VE's testimony regarding an inability to work with multiple absences from work per month; (5) improperly concluding that Plaintiff had past relevant work as an administrative assistant; (6) improperly concluding that Plaintiff maintained her ability to perform past relevant work as an administrative assistant despite findings made in prior Explanations of Determination.  For the following reasons, the ALJ applied the correct legal standards, and the ALJ's decision is supported by substantial evidence.

### A.   RFC

#### i.   Mental Impairments

Plaintiff first contends that the ALJ erred by failing to find Plaintiff's depression and anxiety severe and, even if such impairments were not severe, to include relevant limitations in the RFC and hypothetical to the VE pertaining to those mental impairments.  At step two of the sequential analysis, the ALJ considers the medical severity of a claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  Step two operates as a threshold inquiry.  *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986); *see Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853 (11th Cir. 2013) (*per curiam*).  At step two, a claimant must show that he or she suffers from an impairment or combination of impairments that significantly limits his or her

physical or mental ability to do basic work activities.  *See* 20 C.F.R.  §§ 404.1520(a)(4)(ii), 404.1521, 404.1522(a).  A claimant need show only that his or her impairment is not so slight, and its effect is not so minimal, that it would clearly not be expected to interfere with his or her ability to work.  *McDaniel*, 800 F.2d at 1031; *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (*per curiam*).  "[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality," however.  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).  In other words, an impairment or combination of impairments is not considered severe where it does not significantly limit the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1522; *Turner v. Comm'r of Soc. Sec.*, 182 F. App'x 946, 948 (11th Cir. 2006) (*per curiam*) (citations omitted).

Notably, however, the finding of *any* severe impairment, whether or not it results from a single severe impairment or a combination or impairments that together qualify as severe, is enough to satisfy step two.  *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (citations omitted); *see Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 892 (11th Cir. 2013) (*per curiam*) ("[T]he ALJ determined at step two that at least one severe impairment existed; the threshold inquiry at step two therefore was satisfied."); *see Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010) (*per curiam*) (noting that an ALJ's failure to identify an impairment as severe, where the ALJ found that the plaintiff suffered from at least one severe

impairment, constituted harmless error and was, in fact, sufficient to meet the requirements of step two, and additionally noting that nothing requires the ALJ to identify, at step two, all of the impairments that could be considered severe). Here, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease, peripheral vascular disease, hypertension, coronary artery disease, atrial fibrillation, obesity, diabetes mellitus, chronic kidney disease, retinal disorder, and cataracts (Tr. 27).   Accordingly, since the ALJ determined that Plaintiff suffered from multiple severe impairments at step two, and thus proceeded beyond step two in the sequential analysis, any error in failing to find that Plaintiff suffered from other severe impairments is rendered harmless.  *Gray*, 550 F. App'x at 853-54; *Packer*, 542 F. App'x at 892; *Heatly*, 382 F. App'x at 824-25.

Notwithstanding, the ALJ in fact applied the correct legal standards when considering Plaintiff's mental impairments and limitations in determining that Plaintiff's mental impairments were not severe.  Namely, the ALJ properly applied the "special technique" for evaluating mental impairments, which involves rating the degree of functional limitation based on the extent the mental impairment interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis as to the following four broad functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. § 404.1520a(b) & (c).  With respect to these four functional areas, the ALJ considered the evidence of record regarding Plaintiff's

mental health impairments and limitations and concluded that Plaintiff experienced no limitation as to her ability to interact with others and only mild limitations in her ability to understand, remember, or apply information; concentrate, persist, or maintain pace; and manage herself (Tr. 27-28).  Under the regulations, if the ALJ rates the degrees of limitation as "none" or "mild" then the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Based on his findings, the ALJ concluded that Plaintiff's mental impairments were not severe (Tr. 27-28).

Further bolstering the ALJ's conclusion is an October 2017 opinion from a state agency psychological consultant, who came to the same conclusion as the ALJ after reviewing the evidence of record and further opined that, from a mental health perspective, Plaintiff appeared to have the capacity to perform daily activities (Tr. 75).[2]  Likewise, a second state agency psychological consultant reviewed the evidence of record in January 2018 and also concluded that Plaintiff suffered no more than mild limitations in the four broad functional areas and that Plaintiff's mental impairments were not severe (Tr. 90-91).  Given the ALJ's finding that Plaintiff experienced either no or mild limitations in the four broad functional areas, and the state agency medical consultants' opinions supporting that conclusion, the

---

[2]   In the context of Social Security disability evaluation, federal or state agency psychological consultants are considered highly qualified and experts.  20 C.F.R. § 404.1513a(b)(1).

ALJ appropriately determined at step two that Plaintiff's anxiety and depression were not severe (Tr. 27-28).

The ALJ also properly omitted any limitations from the RFC and hypothetical to the VE regarding Plaintiff's mental impairments, since the record does not support such limitations. At step four of the sequential evaluation process, the ALJ assesses the claimant's RFC and ability to perform past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545. To determine a claimant's RFC, an ALJ makes an assessment based on all the relevant evidence of record as to what a claimant can do in a work setting despite any physical or mental limitations caused by the claimant's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). In rendering the RFC, therefore, the ALJ must consider the medical opinions in conjunction with all the other evidence of record and will consider all the medically determinable impairments, including impairments that are not severe, and the total limiting effects of each. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2) & (e); *see Jamison*, 814 F.2d at 588 ("The ALJ must consider the applicant's medical condition taken as a whole."). In doing so, the ALJ considers evidence such as the claimant's medical history; medical signs and laboratory findings; medical source statements; daily activities; evidence from attempts to work; lay evidence, including statements from the claimant and his or her family and friends; recorded observations; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication or other treatment the claimant takes or has taken to alleviate pain or other symptoms;

treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or symptoms; and any other factors concerning the claimant's functional limitations and restrictions. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 404.1545(a)(3); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

Here, the ALJ considered the evidence regarding Plaintiff's mental impairments and effectively found that it did not demonstrate that Plaintiff experienced limitations that would significantly limit her ability to perform basic mental work activities (Tr. 28, 30, 34).[3]  In discussing Plaintiff's mental health treatment, the ALJ concluded that, though Plaintiff received antidepressants from her primary care physician, psychological findings on mental status examinations through the period at issue were largely within normal limits (Tr. 28, 34).  Indeed, in August 2017, Plaintiff reported to the SSA that she took medication prescribed by her primary care physician for depression but that she never received other treatment or hospitalizations for depression (Tr. 233).  According to Plaintiff, for the two years prior, she would just not want to get out of bed and would cry for no reason (Tr. 233).  Anything could trigger such issues, and the medication would not help with her emotional problems, just her physical pain (Tr. 233).

---

[3]   Basic work activities include activities such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1522(b)(3)-(6).

As the ALJ noted, however, Plaintiff's statements regarding her mental impairments contrast with the findings set forth in her treatment notes. Specifically, Plaintiff's mental status exams indicated primarily normal findings, with Plaintiff appearing alert, fully oriented, and with an appropriate affect, good judgment, normal recent and remote memory, and normal mood with only an occasional report of mild symptoms or episodes of depression or anxiety (Tr. 34, 531-32, 557, 572, 578-79, 585, 594-95, 627, 629-30, 632-33, 635, 681, 685-86, 702-04, 707-09, 716-17, 722). She also indicated no difficulty with concentrating, remembering, or making decisions (Tr. 511, 515, 654, 657). Additionally, while Plaintiff received medication for her mental impairments, with Plaintiff mostly indicating that the medication helped with her symptoms, she sought no other mental health treatment during the relevant period (Tr. 531-32, 629-30, 632-33, 635-36, 681-87). Furthermore, as the ALJ discussed, the state agency medical consultants both reviewed the evidence of record and concluded that Plaintiff's mental impairments were not severe and that Plaintiff did not experience more than mild limitations from such mental impairments (Tr. 28, 34, 75, 90-91). Plaintiff's reported daily activities further undermine her statements regarding the severity of her mental impairments and any limitations stemming therefrom. During the hearing and in response to her physicians, Plaintiff stated that she took care of her personal grooming, including getting dressed, putting on her shoes, and showering; spent time on social media and with her mother, children, and grandchildren; maintained

the ability to drive, including to the hearing; and experienced no difficulty running errands alone (Tr. 62-63, 233, 511, 515, 654, 657).

Plaintiff appears to equate the diagnosis of anxiety and depression with disability or limitation, arguing that, because four medical providers assessed mental health impairments, such impairments imposed significant limitations on her ability to work (Doc. 23, at 25). "Diagnosis of a listed impairment is not alone sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings." *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) (citations omitted). "Disability is determined by the effect an impairment has on the claimant's ability to work, rather than the diagnosis of an impairment itself." *Davis v. Barnhart*, 153 F. App'x 569, 572 (11th Cir. 2005) (*per curiam*) (citation omitted). Further, as noted above, the severity of a medically ascertained impairment is not measured in terms of deviation from purely medical standards of bodily perfection or normality but rather in terms of its effect upon ability to work. *McCruter*, 791 F.2d at 1547. As the record does not demonstrate that Plaintiff's mental impairments caused Plaintiff any functional limitations in her ability to perform work activities, the ALJ properly omitted any mental limitations from the RFC.

Similarly, the ALJ did not err in omitting any mental limitations in the hypotheticals to the VE. When the ALJ utilizes the testimony of a VE, the ALJ must pose an accurate hypothetical to the VE that accounts for all of the claimant's impairments. *Ingram*, 496 F.3d at 1270 (citation omitted). When the ALJ properly

rejects purported impairments or limitations, however, the ALJ need not include those findings in the hypothetical posed to the VE. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) ("[T]he ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported"). Given the ALJ's rejection of Plaintiff's mental limitations, the ALJ was not required to include such limitations in the hypotheticals to the VE. Accordingly, the ALJ did not err in his consideration of Plaintiff's mental impairments, and substantial evidence supports the ALJ's decision in that regard.

### ii.    Diabetic Retinopathy and Diabetic Polyneuropathy

Plaintiff argues that the RFC also failed to properly reflect the limitations imposed by her diabetes mellitus – namely, diabetic retinopathy and diabetic polyneuropathy. In explaining the RFC finding, the ALJ explicitly addressed Plaintiff's complaints regarding her diabetes and the symptoms resulting therefrom, stating:

> The claimant indicated that she ultimately stopped working in 2017 because her diabetes was worsening. In 2017, the claimant became completely dependent on insulin, and she wound up taking extra breaks during the day in order to check her blood sugars and make sure that she was taking her medication properly. The claimant would also wind up leav[ing] work early due to the effects of low blood sugar. In addition to insulin dependency, the claimant testified that she developed neuropathy in her extremities, left worse than right, and retinopathy. Her doctors have discussed the possibility of using an insulin pump, but the claimant testified that using insulin has caused her to gain approximately 25 pounds in the last 12 months.

(Tr. 31). As the ALJ further discussed, with respect to the retinopathy, Plaintiff presented for an eye examination in November 2017, complaining of bilateral

blurred vision and difficulty seeing to perform daily activities and reporting a history of macular swelling, cataracts, and diabetic retinopathy (Tr. 32, 559-62).  According to Plaintiff, she experienced these problems constantly for 10 to 20 years and received injections for macular swelling and laser treatment for her diabetic retinopathy (Tr. 559).  Upon examination, Plaintiff demonstrated best corrected visual acuity in the right eye of 20/50 far-sighted and 20/70 near-sighted and best corrected visual acuity in the left eye of 20/40 far-sighted and 20/50 near-sighted (Tr. 559).

The ALJ also discussed the opinion of a state agency medical consultant, Dr. Jolita Burns (Tr. 33, 93).  Namely, after reviewing the evidence of record in January 2018, Dr. Burns provided an RFC assessment, finding that Plaintiff experienced no visual limitations (Tr. 93).  In doing so, Dr. Burns noted that, although Plaintiff reported vision loss, she was able to drive, see the television with glasses, cook, clean, and take care of her personal care and grooming (Tr. 94, 233).  Indeed, Plaintiff had reported to the SSA in October 2017 that, while she experienced trouble seeing out of one eye, for which she received injections every six weeks, she could see the television and computer screen with glasses and could see well enough to drive (Tr. 233).

Later, in July 2018, Plaintiff complained of increased light flashes, reduced visual acuity, blurriness, and a bad cataract (Tr. 591).  Despite her statements during the July 2018 appointment, Plaintiff repeatedly reported no difficulty seeing; denied eye pain, photophobia, vision change, and visual disturbance; and demonstrated

normal findings, including normal accommodation, as to her eyes upon examination (Tr. 469, 511, 515, 531, 571-72, 577-78, 654, 657, 702-04, 707-09, 716, 722).  Moreover, as the ALJ indicated, Plaintiff stated during the administrative hearing that she took care of her personal grooming, including getting dressed, putting on her shoes, and showering; spent time on social media and with her mother and grandchildren; and maintained the ability to drive, including to the hearing (Tr. 31, 62).

Despite the foregoing, Plaintiff contends that Plaintiff's diabetic retinopathy caused her limitations that would preclude her from performing the job of an administrative clerk, which requires frequent near acuity and accommodation.  *See* U.S. Dep't of Labor, Dictionary of Occupational Titles ("DOT") (4th ed. Rev. 1991), DOT § 219.362-010, 1991 WL 671953.  As the foregoing illustrates, however, the ALJ properly concluded that Plaintiff did not experience any limitations from her diabetic retinopathy.  Rather, Plaintiff maintained the ability to perform an array of daily activities requiring near and far acuity and rarely, if ever, complained of problems with her vision.  Substantial evidence therefore supports the ALJ's decision with respect to Plaintiff's diabetic retinopathy.

Similarly, substantial evidence supports the ALJ's decision as to Plaintiff's diabetic polyneuropathy.  As to the polyneuropathy, in October 2017, Plaintiff reported to the SSA that she experienced neuropathy in both feet and her left hand, could not hold anything in her left hand for more than a few minutes, and had to wear special shoes (Tr. 233).  That same month and months prior, however, Plaintiff

16

demonstrated completely normal musculoskeletal and neurological findings upon examination, including symmetrical muscle strength, full range of motion, intact motor and sensory in all extremities, and normal gait (Tr. 469-72, 531-32, 535-36, 538-39).  Plaintiff likewise demonstrated normal findings, except for weak pulses bilaterally, and reported no complaints in November 2017 with Dr. Daniel Rodriguez at the Diabetes Care Center (Tr. 555-58).  Following that, Dr. Said reported grossly normal cranial nerves and balance and gait within normal limits in February and March 2018, despite Plaintiff's reports of numbness, tingling, and pain (Tr. 568-75).  Due to Plaintiff's complaints of numbness and pain in the neck, right hand, and left hand, Dr. Said ordered an MRI of the cervical spine in March 2018 (Tr. 589-90).  The MRI indicated no central canal stenosis, neuroforaminal stenosis on the left at C4-C5 and bilaterally at C5-C6 and C6-C7, mild disc dehydration, and straightening of the normal cervical lordosis that might have been related to muscular/ligamentous strain and/or sprain (Tr. 589-90).

Subsequently, in May and July 2018, Plaintiff indicated that she experienced "persistent pain all over" or "so much pain in multiple areas" yet demonstrated completely normal musculoskeletal and neurological findings upon examination (Tr. 629, 632).  In August 2018, Plaintiff presented with no musculoskeletal or neurological complaints and demonstrated no abnormal findings upon examination, outside of weak pulses bilaterally (Tr. 593-96).  Later, in November 2018, Plaintiff complained of various pains that presented and lasted a few days and then completely resolved, but, upon examination, she demonstrated normal

findings, such as normal gait, intact cranial nerves, and full range of motion with no tenderness in the left foot, right knee, and right elbow (Tr. 627). In January 2019, Plaintiff reported no musculoskeletal or neurologic issues and demonstrated none on examination (Tr. 702-04). Again, in February 2019, Plaintiff presented with chest pain but expressed no complaints and demonstrated no abnormal findings regarding any musculoskeletal or neurological issues (Tr. 712-19). A couple days later, Plaintiff reported weakness, dizziness, and double vision but showed completely normal musculoskeletal and neurologic findings upon examination, including normal tone and motor strength, normal movement of all extremities, normal gait and station, and grossly intact cranial nerves and sensation (Tr. 685-86). The next month, though Plaintiff reported numbness and tingling in the bilateral hands to Dr. Said (Tr. 575-78), Plaintiff reported no neurologic issues and demonstrated none on examination on more than one occasion, including normal sensation, normal motor function, and no numbness, dizziness, tremor, paralysis, or gait dysfunction (Tr. 677-82, 707-09, 721-23).

Plaintiff primarily points to treatment notes from Dr. Rene Kunhardt, Plaintiff's cardiologist, that simply list peripheral nerve disease and peripheral vascular disease as problems Plaintiff experienced without any complaints from Plaintiff during those appointments regarding the peripheral nerve disease or peripheral vascular disease or neuropathy, without any findings made upon examination by Dr. Kunhardt regarding those impairments or symptoms, and without a suggested treatment plan (Tr. 439-48, 510-19). Plaintiff again appears to

equate diagnosis with disability.  As discussed above, the two are not the same.
Instead, Plaintiff must demonstrate that her diabetic polyneuropathy affected her
ability to work.  *Davis*, 153 F. App'x at 572; *McCruter*, 791 F.2d at 1547.  As Plaintiff
failed to demonstrate and the record fails to support any limitations that Plaintiff
experienced from her diabetic polyneuropathy, the ALJ did not err in failing to
include limitations relating to Plaintiff's diabetic polyneuropathy.  Accordingly,
remand is unwarranted as to issues pertaining to Plaintiff's diabetic retinopathy or
Plaintiff's diabetic polyneuropathy.

### iii.   Dr. Said's Opinion

Next, Plaintiff contends that the ALJ failed to afford adequate weight to the
opinion of Dr. Said, Plaintiff's treating physician.  As the ALJ discussed, Dr. Said
provided an opinion on Plaintiff's limitations in October 2018, wherein he indicated
that he treated Plaintiff for constant aching, shooting, tingling, and radiating pain
that lasted four to five years and which could be expected to last at least twelve
consecutive months due to the severity and duration of her condition (Tr. 33-34,
600-609).  Dr. Said found Plaintiff's impairments reasonably consistent with the
stated symptoms and functional limitations (Tr. 601).  He indicated that Plaintiff's
symptoms were severe enough to interfere with her attention and concentration
frequently due to pain, discomfort, decreased range of motion, occasional anxiety,
and loss of balance and that her ability to deal with work-related stress was markedly
limited for the same reasons (Tr. 601).

According to Dr. Said, as a result of Plaintiff's impairments, Plaintiff could walk approximately half of a block before needing a rest, could continuously sit for 15 minutes at a time, and could continuously stand for 15 minutes at a time due to pain in her legs, loss of balance, and palpitation (Tr. 602).  After sitting for that period, Plaintiff would need to stand and walk around, and, after standing for that period, Plaintiff would need to sit (Tr. 602).  Dr. Said further opined that, during an eight-hour workday, Plaintiff could sit for a total of three hours due to pain and discomfort from a prolonged static position and could stand and walk for a total of four hours due to pain and discomfort from moving (Tr. 603).  Plaintiff would need an allowance to change from sitting to standing at will with an allowance to walk around to relieve pain and discomfort (Tr. 603).  Further, in addition to normal breaks, Dr. Said indicated that Plaintiff would need additional, unscheduled 15-minute breaks during an eight-hour workday every 30 minutes to relieve pain and discomfort (Tr. 603).  Dr. Said noted that Plaintiff would not require her legs to be elevated or require the use of an assistive device to ambulate, but Plaintiff could only occasionally lift or carry less than five pounds and could never lift or carry more than five pounds due to discomfort and occasional loss of balance (Tr. 603-04).  While Dr. Said noted that Plaintiff experienced no environmental limitations, Dr. Said indicated that Plaintiff experienced limitations in performing repetitive reaching, handling, fingering, bending, twisting at the waist, and grasping, turning, and twisting objects, stating that Plaintiff could only perform any of those activities for 10 percent of an eight-hour workday (Tr. 604-05).

With respect to Plaintiff's symptoms related to her chronic pain, Dr. Said stated that Plaintiff experienced fatigue, occasional depression and anxiety, imbalance, decreased range of motion, and palpitation (Tr. 606).  As for pain, Dr. Said indicated that Plaintiff experienced constant, shooting pain registering at a 6/10 in severity bilaterally in Plaintiff's cervical spine, thoracic spine, lumbar spine, shoulders, fingers, hips, legs, and knees (Tr. 606).  Dr. Said noted that fatigue, stress, cold, changing weather patterns, movement, and a static position aggravated Plaintiff's pain (Tr. 606).  According to Dr. Said, Plaintiff showed swelling, muscle spasms, muscle weakness, abnormal gait, sensory loss, tenderness, and muscle atrophy and demonstrated a reduced range of motion in her neck, lower back, shoulders, and hips (Tr. 607).

As to Plaintiff's cardiac condition, Dr. Said noted that Plaintiff demonstrated chest pain, anginal equivalent pain, shortness of breath, fatigue, weakness, edema, palpitations, and dizziness, with daily shortness of breath and chest pressure retrosternal and radiating to the arms while at rest with a pain level registering at a 7/10 (Tr. 607-08).  Dr. Said opined that Plaintiff's cardiac symptoms would constantly interfere with her attention and concentration and that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations identified in the evaluation.  According to Dr. Said, stress played a big role in precipitating Plaintiff's symptoms since her angina was unstable and, as a result, Plaintiff remained incapable of even low-stress jobs (Tr. 608).

Dr. Said further identified the following symptoms that Plaintiff experienced as a result of her diabetes mellitus: fatigue, extremity pain and numbness, muscle weakness, difficulty thinking and concentrating, excessive thirst, rapid heartbeat, chest pain, leg cramping, loss of balance, headaches, general malaise, difficulty walking, frequency of urination, psychological problems, abdominal pain, dizziness, swelling, nausea, and vomiting (Tr. 609). As a result of all of Plaintiff's impairments, symptoms, signs, and limitations, Dr. Said noted that Plaintiff was not a malingerer and described Plaintiff's prognosis as poor due to the severity and duration of her condition, which were confirmed by a history of physical exams, testing, and imaging (Tr. 600-01). He opined that Plaintiff would experience good days and bad days and would likely be absent from work four or more days per month as a result of service-connected impairments or treatment due to pain, discomfort, decreased range of motion, and occasional anxiety (Tr. 605).

In considering Dr. Said's opinion, the ALJ found the opinion not persuasive, given its inconsistency with the objective evidence of record (Tr. 33-34). Specifically, the ALJ determined that the severity of the limitations found by Dr. Said were inconsistent not only with Dr. Said's treatment notes but also with the overall evidence of record and described several inconsistencies therein (Tr. 33-34). Plaintiff now argues that the ALJ failed to afford adequate weight to the opinion of Dr. Said. In doing so, Plaintiff relies upon an inapplicable standard for consideration of a treating physician's opinion (Doc. 23, at 17-18). Namely, Plaintiff contends that the ALJ should have afforded Dr. Said's opinion substantial

or considerable weight unless good cause was shown to the contrary and that the ALJ was required to articulate the reasons for affording less than controlling weight to the opinion of Dr. Said (Doc. 23, at 17-18).  *See, e.g., Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1527(c).  That standard applied to claims filed before March 27, 2017.  *See* 20 C.F.R. § 404.1527.  Here, Plaintiff submitted her application for DIB on August 19, 2017 (Tr. 196-97).  Accordingly, new regulations address how the SSA considers and articulates medical opinions. *See* 20 C.F.R. § 404.1520c; *see also Simon v. Comm'r of Soc. Sec.*, No. 19-14682, 2021 WL 3556433, at *7 n.4 (11th Cir. Aug. 12, 2021) (indicating that 20 C.F.R. § 404.1527 only applies to disability claims filed before March 27, 2017, and claims filed after that date are governed by 20 C.F.R. § 404.1520c, which prescribes a somewhat different framework for evaluating medical opinions).

Under the new regulations, the ALJ must still articulate how he or she considered the medical opinions in rendering the decision.   20 C.F.R. § 404.1520c(a).  Pursuant to 20 C.F.R. § 404.1520c, however, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Rather, an ALJ should consider a medical opinion based on the following factors, as appropriate: supportability, consistency, relationship with the claimant, and specialization, as well as any other relevant factors.  20 C.F.R. § 404.1520c(a) & (c).  The most important factors an ALJ will consider in evaluating the persuasiveness of a medical opinion are

supportability and consistency.  20 C.F.R. § 404.1520c(a) & (b)(2).  For example, the more relevant the objective medical evidence and supporting explanation provide by a medical source to support his or her medical opinion, the more persuasive the medical opinion will be.  20 C.F.R. § 404.1520c(c)(1).  Likewise, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion will be.  20 C.F.R. § 404.1520c(c)(2).

Here, the ALJ appropriately considered Dr. Said's treatment notes and assessed Dr. Said's opinion under the new regulation (Tr. 32-34).  As noted, the ALJ indicated that, given the inconsistency with the objective evidence of record, including Dr. Said's own treatment notes, the ALJ found Dr. Said's opinion not persuasive (Tr. 33-34).  For example, with respect to the cardiac limitations, the ALJ acknowledged Plaintiff's long cardiac history but pointed to the successful stenting procedure in December 2018 and recent cardiac treatment notes, which include Dr. Said's own treatment notes, indicating no shortness of breath, normal sinus rhythm, no jugular venous distension, regular heart rate and rhythm, normal S1 and S2, no gallops, no rubs, no murmurs, normal carotid upstroke, and no carotid artery bruits (Tr. 33, 575-88, 593-99, 608, 635, 638-40, 677-88, 702-10, 721-23).  Further, with respect to Plaintiff's exertional limitations regarding her ability to walk or lift, the ALJ noted inconsistencies between Dr. Said's conclusions that Plaintiff could only walk half a block or occasionally lift and carry less than five pounds and the evidence of record regarding Plaintiff's normal gait, normal muscle

strength and tone, lack of joint abnormalities, normal motor function, normal range of motion, and grossly intact sensation (Tr. 33-34, 586, 627-34, 677-88, 721-23). Given the foregoing inconsistencies and the other inconsistencies highlighted by the ALJ, the ALJ appropriately found Dr. Said's opinion not persuasive.  Under the new regulation, the ALJ applied the proper legal standard, and the decision is supported by substantial evidence.

### iv.   Work Attendance Limitations

Finally, Plaintiff contends that the ALJ erred by not including limitations regarding work attendance in the RFC and hypothetical posed to the VE. According to Plaintiff, as far back as 2017, she had to attend several doctors' appointments and would leave work even when she did not have an appointment when she was not feeling well (Tr. 51-53).  For instance, if her blood sugar became too low, it would take her a while to get her energy back or not be sluggish (Tr. 53). On one occasion, she felt she could not continue to do her job and then her employer pulled her from working on a multi-line phone system, so she opted to go home (Tr. 53). Following that, she sought medical or family leave to go to South Florida for surgery her son was scheduled to undergo and then was told by her employer that she no longer had a job (Tr. 53-54).   Plaintiff contends that her 14 medical appointments or in-patient treatment days during the six-month period from October 2018 through March 2019, combined with the days Plaintiff left work when she was not feeling well, demonstrate that she would be absent beyond what an employer would tolerate (*see* Tr. 51-54, 579, 627, 638, 648-59, 677-88, 702-23).  She

contends that she would miss work frequently, missing approximately one day per week (Tr. 59-60).  Plaintiff therefore argues that the ALJ's decision is not supported by substantial evidence, given the failure to reflect the absences in excess of the range of employer tolerance based upon the VE's testimony.

During the administrative hearing, the ALJ asked the VE whether a hypothetical individual with Plaintiff's background and limitations, and who additionally would miss work at least two days per month or who would be off task at least 15% of the day because of her conditions, could perform Plaintiff's past relevant work (Tr. 66).  In response, the VE indicated that such hypothetical individual could not perform Plaintiff's past relevant work (Tr. 66).  The ALJ followed up, asking if, considering those two limitations, even if considered independently, the hypothetical individual could perform full-time employment on a regular and sustained basis (Tr. 66).  The VE responded that such individual could not (Tr. 66).  Finally, the ALJ included several limitations, including that the hypothetical individual would miss work four or more days per month, and the VE indicated that an individual with those limitations could not perform any full-time employment on a regular and sustained basis (Tr. 66-67).

Notwithstanding, Plaintiff failed to demonstrate that her absenteeism constituted a functional limitation or precluded her from employment.   In determining a Plaintiff's RFC, the ALJ must consider all the relevant evidence of record, including the effects of treatment, taking into consideration limitations or restrictions imposed by the mechanics of treatment, such as the frequency of

treatment, duration, disruption to routine, and side effects of medication. SSR 96-8p, 1996 WL 374184, at *5. Though courts have rejected the argument that numerous medical appointments render a claimant disabled, *Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902, 904 (11th Cir. 2017), the ALJ must still consider the effects of a claimant's treatment in conjunction with the other evidence of record.

In this instance, the ALJ properly considered Plaintiff's testimony regarding her treatment, as well the treatment notes pertaining to the medical treatment she underwent during the relevant period, in conjunction with the other evidence of record (Tr. 30-34). Neither Plaintiff's testimony nor the treatment records support Plaintiff's position that her absenteeism would preclude employment. As an initial matter, Plaintiff's testimony indicates that she opted to go home on one occasion rather than seek an accommodation or continue working in a different capacity when her employer pulled her from working on a multi-line phone system (Tr. 53). She further testified that her employer indicated that she no longer had a job after she sought two weeks of medical or family leave to go to South Florida for her son's surgery and then took an unspecified amount of time off from her job for that reason (Tr. 53-54). Such testimony does not support a finding that she would consistently be absent from work due to her impairments but rather shows that, on one occasion, Plaintiff unilaterally decided to leave work and, on another occasion, took an unspecified amount of extended leave that may or may not have been approved by her employer and thus led to her termination.

Moreover, nothing in the record indicates that Plaintiff was required, or would be required, to schedule her medical appointments during working hours or for an entire working day such that her appointments would interfere with her ability to obtain work or maintain a job. *See Cherkaoui*, 678 F. App'x at 904. As SSR 96-8p states, the RFC is an assessment of an individual's ability to perform sustained work-related physical activities in a work setting on a regular and continuing basis, meaning eight hours per day, five hours per week, or an equivalent work schedule. 1996 WL 374184, at *2. Plaintiff has not demonstrated that her purported absenteeism would prevent her from scheduling her appointments outside of working hours for a regular or equivalent work schedule. Though Plaintiff may have scheduled 14 appointments in a prior 6-month period, it remains pure speculation by Plaintiff that she would require that many appointments or even more appointments during any relevant period going forward, especially where many of her treatment notes indicate that follow-up appointments were required anywhere from one to three to six months apart (*see, e.g.,* Tr. 531-36, 555-58, 568-74, 582-88, 591, 627-30). As such, Plaintiff failed to demonstrate that her absenteeism would preclude her from performing work on a regular and sustained basis during a standard or equivalent work schedule. The ALJ thus did not err in his consideration of Plaintiff's treatment record and its impact upon Plaintiff's ability to work.

**B.    Past Relevant Work**

       **i.    Job Requirements and Composite Job**

With respect to her past relevant work, Plaintiff argues that the ALJ misclassified her job as an administrative assistant.  According to Plaintiff, her job as an administrative assistant constituted a composite job with job requirements outside the scope of the DOT's definition of an administrative assistant and, because she performed her past relevant work at the medium exertional level, which exceeds the RFC for a reduced range of light work, she could not perform her past relevant work as an administrative assistant.  Plaintiff contends that the ALJ failed to discuss the responsibilities or mental and physical demands of Plaintiff's past relevant work and, instead, simply stated that the past relevant work was as an administrative assistant without further elaboration.  In addition, Plaintiff argues that the ALJ failed to ask any questions about Plaintiff's past work at the hearing, simply stating that he "had reviewed all the work histories in the file already, so we don't need to go through your work history" (*see* Tr. 34, 49).

A claimant bears the burden of proving that his or her impairments prevent the claimant from performing past relevant work either as actually performed or as it is performed in the national economy.  *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 775 (11th Cir. 2010) (citing *Jackson v. Bowen*, 801 F.2d 1291, 1293-94 (11th Cir. 1986)).  Importantly, "where the claimant's specific prior job might have involved functional demands and duties significantly in excess of those generally required for such work by employers in the national economy, the claimant must still demonstrate that, in addition to being unable to perform the excessive functional demands actually required by her former job, she cannot perform the

functional demands and job duties of the position as generally required by employers nationwide." *Klawinski*, 391 F. App'x at 775 (citing SSR 82-61, 1982 WL 31387 (Jan. 1, 1982)).  In considering a claimant's past relevant work, "[t]he regulations require that the claimant not be able to perform his past *kind* of work, not that he merely be unable to perform a specific job he held in the past." *Jackson*, 801 F.2d at 1293 (emphasis in original) (citations omitted).  Accordingly, a claimant needs to demonstrate that he or she cannot return to his or her former *type* of work rather than to a specific prior job.  *Jackson*, 801 F.2d at 1293 (emphasis in original and citations omitted); *see* SSR 82-61, 1982 WL 31387, at *2.

"The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level[,] exertional demands and nonexertional demands of such work."  SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982).  In applying for benefits, Plaintiff thoroughly described her prior job as an administrative assistant as involving office ordering, sales orders, invoicing, bookkeeping, filing, answering phones, and packing, shipping, and receiving boxes (Tr. 213-14, 223).  In her role as an administrative assistant, Plaintiff used machines, tools, or equipment and used technical knowledge or skills (Tr. 214).  Each day she worked as an administrative assistant, Plaintiff would walk, stand, and sit for four hours per day, would frequently lift 25 pounds, and lifted up to 50 pounds (Tr. 214, 223).

In addressing Plaintiff's past relevant work during the administrative hearing, the ALJ indicated that he did not need to go through the work history, as he

reviewed everything in the record regarding Plaintiff's job history (Tr. 49).  Later in

the hearing, however, the ALJ circled back to the issue of Plaintiff's past work (Tr.

63-67).  The ALJ asked the VE if he was familiar with the jobs that exist nationally

and whether the VE reviewed the exhibits from the case file and listened to

Plaintiff's testimony, to which the VE responded in the affirmative to each (Tr. 64).

The ALJ then engaged in the following exchange with the VE:

> Q     Based upon the periods of [substantial gainful activity ("SGA")]
> already given, do you need additional information to address the work
> performed during those times?
>
> A     No, Your Honor.
>
> Q     Please identify for me if you will then the claimant's past work
> during those periods of SGA and include the exertional and skill levels
> under the DOT for any jobs performed.
>
> A     Your Honor, there was only one position and that was an
> administrative assistant.  And the DOT number is 219.362-010.  It's
> classified as light and it is semi-skilled work, SVP of 4.
>
> Q     To your knowledge, any difference in the way the claimant
> performed that job and the way it's customarily performed in the
> national economy?
>
> A     Yes, Your Honor, according to the file[,] the claimant
> performed it at the medium exertional level.
>
> Q     Any difference in the manner of which you've classified the job
> and the way it's classified under the DOT?
>
> A     No, Judge.

(Tr. 64-65).  Following that, the ALJ described a hypothetical individual with

Plaintiff's background and limitations to the VE and inquired whether such

hypothetical individual could perform Plaintiff's past work as an administrative

assistant (Tr. 65).  In response, the VE testified that such hypothetical individual could perform the past work (Tr. 65).  The ALJ followed up by asking whether that individual could perform the past work as it is normally performed or as Plaintiff actually performed it or both (Tr. 65-66).  The VE responded that such hypothetical individual could perform the past work as it was normally performed but not as Plaintiff performed it (Tr. 66).

The DOT describes the job duties of the "administrative clerk" position as follows:

> Compiles and maintains records of business transactions and office activities of establishment, performing variety of following or similar clerical duties and utilizing knowledge of systems or procedures: Copies data and compiles records and reports.  Tabulates and posts data in record books.   Computes wages, taxes, premiums, commissions, and payments.  Records orders for merchandise or service.  Gives information to and interviews customers, claimants, employees, and sales personnel.  Receives, counts, and pays out cash. Prepares, issues, and sends out receipts, bills, policies, invoices, statements, and checks.   Prepares stock inventory.   Adjusts complaints.  Operates office machines, such as typewriter, adding, calculating, and duplicating machines.  Opens and routes incoming mail, answers correspondence, and prepares outgoing mail.  May take dictation. May greet and assist visitors.  May prepare payroll.  May keep books.  May purchase supplies.  May operate computer terminal to input and retrieve data.  May be designated according to field of activity or according to location of employment as Adjustment Clerk (retail trade; tel. & tel.); Airport Clerk (air trans.); Colliery Clerk (mine & quarry); Death-Claim Clerk (insurance); Field Clerk (clerical). May be designated: Agency Clerk (insurance); Auction Clerk (clerical); Construction-Records Clerk (construction; utilities); Shop Clerk (clerical).

DOT § 219.362-010, 1991 WL 671953.  As noted, Plaintiff provided a thorough description of her job requirements and duties in her past work as an administrative

assistant (Tr. 213-14, 223).[4]   Both Plaintiff's description of the responsibilities and mental and physical demands of her past work as an administrative assistant and the VE's testimony indicate that Plaintiff's past relevant work as an administrative assistant comports with the job duties required of an administrative clerk under the DOT.[5]   The record reflects that the ALJ and the VE each reviewed Plaintiff's job histories and listened to her testimony regarding her abilities and limitations in concluding that Plaintiff maintained the ability to perform her past work as an administrative assistant, and, notably, despite being represented by counsel at the administrative hearing, no questions were asked of the VE (or Plaintiff) by Plaintiff's counsel regarding Plaintiff's past relevant work or whether the past relevant work constituted a composite job (Tr. 34, 43-67).   Though Plaintiff may not have maintained the ability to perform the job as she *specifically* performed it, she maintained the ability to perform the job as it is generally performed.   SSR 82-61, 1982 WL 31387, at *2 ("A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy.   Under

---

[4]  This is therefore not a case where there was no evidence in the record of the physical or mental requirements of her past work or a detailed description of the duties required, as Plaintiff contends.  *See, Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) ("Where there is no evidence of the physical requirements and demands of the claimant's past work and no detailed description of the required duties was solicited or proffered, the Secretary cannot properly determine whether the claimant has the residual functional capacity to perform his past relevant work.").

[5]  Plaintiff provides the listing for an administrative clerk in the Job Browser Pro – by SkillTRAN, which provides the identical description of the administrative clerk as that set forth in the DOT description (Doc. 23, Ex. A, at 1).

this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'").  Her argument that the ALJ failed to consider the responsibilities and mental and physical demands of her past work in determining that she maintained the ability to perform the job requirements of an administrative assistant is thus unavailing.

Plaintiff's argument regarding the classification of the administrative assistant job as a composite job is similarly unavailing.  SSR 82-61 describes "composite jobs" as jobs including "significant elements of two or more occupations and, as such, have no counterpart in the DOT" and directs that situations involving composite jobs "will be evaluated according to the particular facts of each individual case."  1982 WL 31387, at *2.  Here, Plaintiff asserts that her prior work as an administrative assistant was a composite job because she performed bookkeeping, invoicing, packing, shipping, receiving, creating sales orders, and other tasks, which fall outside the scope of an administrative assistant.  Notwithstanding Plaintiff's assertion to the contrary, these job duties fall within the description of the administrative clerk, which specifically includes such duties as recording orders for merchandise or service; preparing receipts, bills, invoices, statements, and checks; preparing stock inventory; receiving incoming mail; preparing outgoing mail; and keeping books.  DOT § 219.362-010, 1991 WL 671953.

Further, even affording Plaintiff the benefit of the doubt in finding that she

performed some duties outside the scope of the administrative clerk position, the fact that Plaintiff may have performed an unrelated task outside of the job duties listed in the DOT description for an administrative clerk does not render her prior position a composite job or demonstrate that she could not perform her past relevant work as generally performed.  To establish that her position was a composite job, Plaintiff needed to show that the extra duties constituted some of the "main duties" of her prior job by, for instance, introducing evidence of how much time she spent on the outside duties or otherwise establishing that the duties were a significant element of the job.  *See Smith v. Comm'r of Soc. Sec.*, 743 F. App'x 951, 954 (11th Cir. 2018).  The only identifiable difference between the way Plaintiff performed her prior work and the way that the administrative clerk position is generally performed in the national economy that Plaintiff points to is the exertional level required to perform some of the prior job duties.  Plaintiff's own statements on that point appear to conflict, however.

Initially, she indicated that she frequently lifted 25 pounds, meaning from 1/3 to 2/3 of the workday, but the heaviest weight she lifted in her job was 20 pounds (Tr. 214).  She then indicated that she frequently lifted 25 pounds, but the heaviest weight she lifted in her job was 50 pounds (Tr. 223).  She also stated that she was not required to handle large objects (Tr. 214, 223).  The record is therefore unclear as to what amount of weight Plaintiff was required to lift with any regularity in her position.  If the weight did not exceed 20 pounds, her work would be classified as light, but, if the weight ranged from 25 to 50, her work would be classified as

medium.  *See* 20 C.F.R. § 404.1567(b) & (c).  Considering Plaintiff's statements, the VE classified Plaintiff's prior work as medium exertional work (Tr. 34, 64-65).  Although Plaintiff may have performed her past relevant work at the medium exertional level rather than the light exertional level, such a finding does not lead to the conclusion that her past work constituted a composite job, especially where the main job duties as described and as performed are nearly identical.  Regardless, the ALJ and VE acknowledged the difference in exertional requirements between Plaintiff's description of the prior work and the DOT's description of the administrative clerk and determined that, notwithstanding the difference, Plaintiff could perform her prior work as it is generally performed in the national economy rather than as she specifically performed it (Tr. 34, 64-67).  Given the nearly universal overlap in job duties between Plaintiff's prior work and the administrative clerk position identified by the VE, substantial evidence supports the ALJ's finding that Plaintiff maintained the ability to perform her past relevant work

### ii.    Prior Explanations of Determination

Plaintiff further argues that the ALJ erred in finding that Plaintiff could perform her past relevant work as an administrative assistant by failing to address the SSA's prior Explanations of Determination.  As Plaintiff notes, in a December 1, 2017 Explanation of Determination, the SSA stated that "[a]lthough you may need treatment for your condition, and it may limit your ability to perform your past work, disability cannot be established because you are still capable of performing work that requires less physical effort, and only a very short, on-the-job

training period (Tr. 83).  The January 9, 2018 Explanation of Determination issued upon reconsideration repeated the initial determination findings from December 1, 2017 (Tr. 98).  Plaintiff asserts that the ALJ ignored these prior findings and improperly concluded that Plaintiff maintained an ability to perform her past relevant work as an administrative assistant, contrary to the findings made in the Explanations of Determination.

As the Commissioner notes, the Explanations of Determination are prepared by disability examiners.  SSA Program Operations Manual System ("POMS") DI 24501.001B(1)(d)(1)-(2).[6]  Notably, the SSA considers findings made by a state agency disability examiner at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether a claimant is disabled to constitute evidence that is "inherently neither valuable nor persuasive."  20 C.F.R. § 404.1520b(c)(2).  The regulations therefore direct that an ALJ will not provide any analysis about how he or she considered such evidence in rendering a decision.  20 C.F.R. § 404.1520b(c).  Accordingly, the ALJ was not required to address the Explanations of Determination in rendering the decision as such evidence was neither valuable nor persuasive to determining whether Plaintiff maintained the ability to perform her past work.

Moreover, an initial determination is binding unless the claimant requests a reconsideration within the state time period or the SSA revises the initial determination.  20 C.F.R. § 404.905.  Similarly, a reconsideration determination is

---

[6] *See* https://secure.ssa.gov/poms.nsf/lnx/0424501001 (last visited August 23, 2021).

binding unless the claimant or any other party to the reconsideration requests a hearing before an ALJ within the stated time period, and a decision is made.  20 C.F.R. § 404.921(a).  Here, Plaintiff received an initial determination on November 30, 2017 (Tr. 82), with an Explanation of Determination regarding the initial determination issued on December 1, 2017 (Tr. 83).  Following that, Plaintiff sought reconsideration from the SSA (Tr. 107), thus terminating any binding effect of the initial determination.  *See* 20 C.F.R. § 404.905.  The SSA then issued the reconsideration determination and corresponding Explanation of Determination on January 9, 2018 (Tr. 97-98, 108-13).  Plaintiff subsequently requested a hearing before the ALJ on January 17, 2018 (Tr. 114-15).  The ALJ conducted a hearing (Tr. 41-68), after which the ALJ issued a decision (Tr. 22-40).  The January 2018 reconsideration determination therefore was also not binding on the ALJ, and, accordingly, the ALJ did not err in failing to incorporate the prior findings from either the initial determination or the reconsideration determination in setting forth the RFC or in considering Plaintiff's ability to perform her past relevant work.  *See* 20 C.F.R. §§ 404.905, 404.921.

## IV.

For the foregoing reasons, it is hereby

RECOMMENDED:

1.      The decision of the Commissioner be affirmed.

2.      The Clerk be directed to enter final judgment in favor of the Commissioner and close the case.

IT IS SO REPORTED in Tampa, Florida, on this 23rd day of August, 2021.

ANTHONY E. PORCELLI
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. § 636(b)(1)(C).  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).  **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

cc:    Hon. Thomas P. Barber
       Counsel of Record